## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CASE NO.:

SURGERY CENTER OF VIERA, LLC,

    *Plaintiff,*

v.

AETNA LIFE INSURANCE COMPANY,
and BREVARD ACHIEVEMENT CENTER, INC.,

    *Defendants.*

_____/

## COMPLAINT

Plaintiff, Surgery Center of Viera, LLC ("SCV"), as medical provider, authorized representative, assignee of patient / insured, and power of attorney of patient / insured C.S., sues Defendants, Aetna Life Insurance Company ("Aetna"), and Brevard Achievement Center, Inc. ("BAC"),[1] as follows:

---

[1] The Plan document is attached hereto as **Exhibit A** and incorporated herein by reference. This Plan appears to be self-funded / self-sponsored. *See, e.g.,* Ex. A, GR-9N at 1. So, if BAC had nothing to do with pre-suit claim and / or appeal decision-making as to the unreasonably low rate of payment at issue here (*i.e.,* the liability component of Counts II-IV below), SCV is willing to dismiss without prejudice BAC as to Counts II-IV if it were to agree / stipulate as to the following: prompt satisfaction of monies deemed owed to SCV by the trier of fact; *i.e.,* prompt satisfaction of outstanding benefits when Aetna's claim / appeal decision-making as to the amount of medical service monies tendered to SCV is someday determined improper. Similarly, SCV would be willing to dismiss without prejudice the BAC as to Count I below if it was to agree / stipulate as to the following: prompt provision of outstanding administrative records and satisfaction of related penalty, or prompt provision of an affidavit (or the like) stating that Aetna was solely responsible for records production; *i.e.,* stating that records production responsibilities had been delegated to Aetna.

## NATURE OF THE ACTION, PARTIES, JURISDICTION, AND VENUE

1.      This action arises, in part (Count I), under the Employment Retirement Income Security Act of 1974, Title 29, United States Code, Sections 1000-1461 ("ERISA"), for Defendants' administrative record production failures relating to the subject C.S.-related health insurance claim, implicating ERISA, 29 U.S.C. § 1024(b), 29 U.S.C. § 1132(c)(1), 29 C.F.R. § 2575.502c-1 to be precise, and 29 C.F.R. § 2560.503-1(h)(2)(iii).[2] This action also arises, in part (Counts II-IV), under state law for Defendants' wrongful, unsubstantiated underpayment of monies owed to SCV for medical services SCV provided to the patient / insured, C.S., on July 17, 2018, which such causes of action have absolutely nothing to do with "right of payment" / coverage (*i.e.*, have everything to do with unreasonably low "rate of payment" / benefits) and which such causes of action have to do with third-party re-pricing contracts separate and distinct from the insurance policy /

---

[2] One of the many problems created by Defendants' refusal to timely produce the administrative record and / or other germane documents required by Federal Codes and / or insurance contract (discussed in greater detail below in the common allegations and Count I) is SCV's inability to confirm with 100% certainty that the underpayment aspect of this dispute emanates solely from a pricing dispute, but that certainly appears to be the situation, hence this Complaint being pleaded as a "rate of payment" dispute *predicated purely on third-party re-pricing contracts separate and distinct from the insurance policy / plan document*. Federal authority makes clear that a "rate of payment" dispute is subject to state law rather than ERISA federal law, especially where (as here) the resolution of Counts II-IV does not have a significant enough (or hardly any) relationship to the insurance policy / plan document. Because Defendants' legally and contractually repugnant refusal to timely produce administrative / germane records has stymied SCV's ability to make precise heads-or-tails of the reasons for Defendants' claim underpayment (as was / is SCV's legal and contractual right), SCV reserves the right to amend this Complaint (if necessary) to expound on Counts II-IV relating to owed monies once Defendants are made to produce the germane documentation / information (Count I) upon which the claim payment amount decision was based.

plan document.[3]

2.     At all material times, SCV was a medical provider and a Florida limited liability company with its citizenship (*i.e.*, principal place of business / "nerve center") in Viera, Florida, Brevard County. SCV is *sui juris* in all respects. SCV's members are as follows: (a) Dr. Ara Deukmedjian, domiciled in Brevard County, Florida, (b) Sun Deukmedjian, domiciled in Brevard County, Florida, and (c) Dr. Bharat Patel, domiciled in Brevard County, Florida. At all material times, SCV was the authorized representative of C.S. with an assignment of benefits and power of attorney as well,[4] having provided subject medical services to C.S. for which a proper amount of compensation (Counts II-IV) was / is due and owing and records relating to same (Count I) were / are due and owing. And, again, Defendants honored such authorized representative and assignee capacities by, for examples, carrying out pre-suit appeal with SCV and tendering partial claim payment directly to SCV. At the very least, such pre-suit Defendants conduct constitutes a waiver and / or estoppel of any anti-assignment argument Defendants may try to *ex post facto* make in the courtroom.

3.     At all material times, Aetna was an insurance company with its principal place of business / headquarters ("nerve center") in the State of

---

[3] Due to the records production failure mentioned in footnote 2, *supra*, SCV is not on a level evidentiary playing field (so to speak) and accordingly reserves the right to amend this Complaint (if necessary) to expound on Counts II-IV related allegations after Defendants' production of outstanding records (Count I).

[4] All germane authorization and / or assignment paperwork in SCV's possession is attached hereto as **Exhibit B** (in redacted form) and incorporated fully herein by reference.

Connecticut and engaged in the business of selling insurance, administering insurance, and / or deciding and paying insurance claims throughout the country, including in the State of Florida.

4.     At all material times, BAC was a company that trained and provided work experience for adults with disabilities. BAC maintained a principal place of business / headquarters ("nerve center") in the State of Florida and, upon information and belief (*see* n. 1, *supra*), engaged in insurance Plan administration and / or sponsorship.

5.     This Court possesses original jurisdiction pursuant to Title 29, United States Code, Section 1132(c)(1), and Title 28, United States Code, Section 1331 at least with respect to Count I. Pursuant to Title 28, United States Code, Section 1367, the Court has pendent jurisdiction over Counts II-IV.[5]

6.     Venue is proper in the Middle District Court of Florida pursuant to Title 28, United States Code, Section 1391(b), since, for examples, (a) a substantial part of the events or omissions giving rise to the subject action occurred in this jurisdiction, namely the subject medical procedure, Defendants' underpayment of the subject insurance claim both at the initial claim and

[5] Should this Court for some reason dismiss Count I and thereafter refuse to exercise ancillary jurisdiction over Counts II-IV (which would not be in the spirit of judicial or party economy), SCV respectfully requests that Counts II-IV be transferred to state court and / or an opportunity to amend Counts II-IV to sound in ERISA so as to maintain jurisdiction in this Court (though SCV is not certain it would wish to relent to the latter course since this pure rate of payment pricing dispute should not be subject to ERISA). Plus, it should be noted that if BAC is dismissed out of this action (*see* n. 1, *supra*), diversity jurisdiction would rest in this Court, as SCV and Aetna are diverse and the amount in controversy exceeds $75,000.00.

subsequent pre-suit appeal stages (Counts II-IV), and Defendants' refusal to supply germane documentation / information required by federal law (Count I) and the insurance contract for that matter and the final appeal decision letter for that matter, and (b) the Orlando Division of this Court has personal jurisdiction due to Defendants' minimum contacts in this forum.

7.     All conditions precedent to the institution of this action (*e.g.*, administrative pre-suit appeals) have occurred, been performed, been waived, or were futile.

## COMMON ALLEGATIONS

8.     Upon information and belief, the Plan's Group number was / is GP-499908-AFA120002070, and the Plan (at least as to the medical benefits as issue here) was an Aetna PPO Medical Plan-Med Premier-PA product. The patient's Member I.D. number was / is W203085298, and the carrier insurance card account number was / is (80840) 9140860054. The assigned claim identification number was / is 218-772756-00 and the assigned patient account number was / is 000200014021. Again, a copy of the insuring agreement (which is separate and distinct from the re-pricing contracts / agreements at issue in this lawsuit, *see* **Exhibit C** incorporated fully herein by reference, and whatever mystery re-pricing program Aetna employed) is attached as Exhibit A and incorporated fully herein by reference.

9.     At all material times, C.S. was covered (*i.e.*, coverage is not an issue here) by the Plan as evidenced by several things, with examples now discussed.

a. If C.S. was not an eligible / covered insured, the subject claim would not have been paid by Defendants in any amount, and this eligibility and claim payment correlation reality is stated in the pre-authorization paperwork discussed below and attached as **Exhibit D**. Exhibit D is incorporated fully herein by reference.

b. If the subject surgery (which such surgery was broken down by codes found in the HCFA found in SCV's initial claim submission packet) had not been covered,[6] the subject claim would not have been paid by Defendants in any amount. Regarding coverage of the subject HCFA codes, Defendants' EOB furnished by Aetna (further discussed below) is attached as **Exhibit F** and evidences Defendants' coverage decision – Defendants properly covered the claim, but the EOB simply says, in pertinent part that: "[t]he member's plan provides benefits for covered expenses at what we find to be a recognized or reasonable charge. The reasonable charge determination on the claim resulted in a reduction in payment." Exhibit F is incorporated fully herein by reference. As one can plainly see from the Aetna-issued EOB, Defendants unilaterally re-priced the subject claim and did not deny any aspects of the claim on coverage grounds (*e.g.*, medical necessity, experimental / investigational). To this day, we really have no idea

---

[6] The HFCA form that was part of SCV's twenty-five-page claim submission package to Defendants, which such claim submission package is noted below, is attached as **Exhibit E**. This HCFA exhibit is incorporated fully herein by reference.

how Aetna came up with payments totaling $33,384.19 (on a billed amount of $223,988.00) because at every turn (SCV's requests and undersigned counsel's requests), Defendants have secreted how they came up with $33,384.19; *i.e.*, have never substantiated their determination that $33,384.19 was a "reasonable" or "recognized" amount for of payment for the subject procedure. *See* Ex. A at 100 (explaining that if pricing was not negotiated with the medical provider, pricing would turn to an assessment of pricing for like procedures within the subject geography or pricing would turn to the 80th percentile of FAIR Health). "Unilaterally" because applicable re-pricing contracts (that SCV had actually agreed to, unlike the unagreed to Aetna mystery re-pricing contract / agreement / formula / program) were already in place (*see* Ex. C). Again, Plaintiff presently does not possess the paperwork associated with the mystery Aetna re-pricing formula because Defendants have wrongly secreted this paperwork (the very paperwork that would evidence how on earth Defendants came up with its unreasonably low rate of payment) from SCV in their perpetual refusal to substantiate the unjustifiably low rate of payment force-fed to SCV here. But, as with the re-pricing contracts (Ex. C) that SCV maintains should apply here in determining the proper rate of payment (or at the very least, re-pricing should have hinged on publicly available Agency for Health

Care Administration ("AHCA")[7] data of a geographic nature or the 80th percentile of FAIR Health), the mystery Aetna re-pricing contract / agreement / formula / program unilaterally implemented by Defendants in arriving at the disputed unreasonably low claim payment amount is also separate and distinct from the insurance policy / plan document (Ex. A). Meaning, there is absolutely no "relation to" defensive ERISA preemption at play with a pricing dispute of this nature predicated on re-pricing contracts standing alone from Exhibit A.

In sum, as evidenced by the variety of things noted in this averment, this action has nothing to do with coverage (*i.e.*, "right of payment"), it has everything to do with the amount Defendants paid out (*i.e.*, "rate of payment") on covered HCFA codes based on a mystery Aetna re-pricing contract / formula / program separate and distinct from the plan insurance document (Exhibit A). In other words, the mystery Aetna re-pricing contract / formula / program that Defendants used in re-pricing the subject claim and the re-pricing contracts / agreements (Ex. C) that SCV contends should have been used do not "relate to" the plan document (Ex. A); *i.e.*, resolution of Counts II-IV will not relate to (at least not beyond a fleeting reference to, at most) the plan document (Ex. A). Once more, "relation to" defensive ERISA preemption simply does not apply here in relation to Counts II-

---

[7] *See, e.g.*, http://www.floridahealthfinder.gov/LandingPages/HospitalASC.aspx and http://www.floridahealthfinder.gov/CompareCare/SelectChoice.aspx.

IV. And as many Courts (several in this jurisdiction, to boot) have found, complete preemption most definitely does not apply to cases of this ilk.

10.     The fact that this dispute has nothing to do with coverage (*i.e.*, has everything to do with pricing / rate of payment) is further evidenced by Defendants' pre-surgery authorization paperwork (*see* Ex. D). The pre-surgery authorization paperwork (Ex. D) and process is designed to put coverage (but not the eventual amount of claim payment) to rest, which, as discussed above (and as evidenced by Ex. D) is what happened – Defendants deemed the subject procedure medically necessary (which such medical necessity would relate to coverage). Exhibit D is incorporated fully herein by reference.

11.     At all material times leading up to the subject medical services received from SCV, C.S. suffered from severe lumbar pain, radiculopathy, neurogenic claudication, and drop foot. C.S. tried alternative, conservative management treatments, which failed and surgical treatment was deemed medically necessary by both SCV (as evidenced by, for examples, the "operative note," "history and physical," and "letter of medical necessity for surgery" found in SCV's claim submission package, *see* Ex. G) and Aetna (as evidenced by, for example, the pre-authorization paperwork attached as Exhibit D). So, on July 17, 2018, SCV operated on C.S. to remedy the medical conditions.

12.     By letter dated July 3, 2018, and prior to the subject procedure, Aetna (*via* affiliate ActiveHealth) issued information to SCV approving surgical codes. As mentioned above, this paperwork is attached as Exhibit D.

13.    As mentioned above, SCV's billed charges for the subject medical services rendered to C.S. totaled $223,988.00, and a claim package was submitted to Aetna relating to same on July 31, 2018 (*via* certified mail). The SCV cover letter to its claim submission packet is attached hereto as **Exhibit G[8]** and makes specific reference to SCV's appropriate expectation that claim payment would unfold pursuant to one of the germane re-pricing contracts (*see* Ex. C) that existed (not some unknown Aetna re-pricing contract that Defendants would eventually unilaterally employ), which, again, such re-pricing contracts (even the yet discovered Aetna re-pricing contract / formula / program that Defendants employed) are separate and distinct from the plan document (Exhibit A); *i.e.*, again, resolution of Counts II-IV (which hinge on the appropriate re-pricing mechanism) will require little (if any) reference to Exhibit A and certainly not a substantive reference to / "interpretation of" Exhibit A, which such substantive reference / "interpretation of" a plan document (rather than a cursory glance at a plan document, as *might* be required here) in order to resolve a rate of payment dispute is what would militate toward "relation to" defensive ERISA preemption.

14.    At all material times, Aetna was in agreement with Preferred Medical Claim Solutions ("PMCS") (as Aetna's affiliate and / or subcontractor and / or vendor and / or agent and / or the like) and / or MultiPlan (as Aetna's affiliate and / or subcontractor and / or vendor and / or agent and / or the like) to secure

---

[8] SCV's entire claim submission package is attached as Exhibit G in redacted form and incorporated fully herein by reference.

discounted rates from providers (like SCV), which were secured here in relation to SCV.[9]

15.     The PMCS allowed amount re-pricing contract (*see* Ex. C) was in full force and effect and was a legally valid and binding contract that established / developed (a) an allowed amount re-pricing rate of 80% of SCV's billed charges less patient responsibilities (*e.g.*, co-pay, deductible, co-insurance) subject to the patient's annual out-of-pocket maximum, and (b) a 100% reimbursement rate for hard costs (*e.g.*, prosthetics / implants). The MultiPlan allowed amount re-pricing contract (*see* Ex. C) was in full force and effect and was a legally valid and binding contract that established / developed (a) an allowed amount re-pricing rate of 60% of SCV's billed charges less patient responsibilities (*e.g.*, co-pay, deductible, co-insurance) subject to the patient's annual out-of-pocket maximum, and (b) a 120% reimbursement rate for hard costs (*e.g.*, prosthetics / implants).

16.     Notwithstanding the existing PMCS and MultiPlan contracts / agreements in place (which, again, were arranged by Aetna with PMCS and MultiPlan as its vendors / agents), by way of EOB dated December 3, 2018, on

---

[9]Again, a copy of the pertinent pages of the PMCS and MultiPlan re-pricing contracts that were procured on Aetna's behalf (along with the PMCS and MultiPlan "client" lists listing Aetna) are attached hereto as Exhibit C. Again, Exhibit C is incorporated fully herein by reference. Of note, the PMCS and MultiPlan contracts (or at least germane pages thereof) was supplied to Defendants in SCV's claim submission package (as is SCV's routine with claim submissions, scores of which have involved Aetna over the years), and SCV made clear its expectation that the claim would be priced pursuant to these PMCS and / or MultiPlan contracts / agreements that were brokered by Aetna with PMCS and MultiPlan being Aetna's vendor, agent, or the like tasked with achieving discounted rates from medical providers like SCV. Also in SCV's claim submission packet was data showing the reasonableness of its charges in comparison to other facilities within a reasonable geographical radius of SCV.

Aetna letterhead, Defendants underpaid the subject claim, tendering $33,384.19 predicated on some mystery re-pricing formula falling outside Exhibit A implemented by Aetna. More specifically, Defendants failed to properly pay (proper amount, that is) the codes billed by SCV in connection with the medical procedure. The nakedness of the EOB (Ex. F) is plain, and this "leave SCV in the evidentiary dark" problem was compounded by Defendants' failure to provide SCV and undersigned counsel with requested records (Count I).

17.    This matter does not present a coverage dispute (*i.e.*, "right of payment" dispute) because Defendants properly conceded coverage *via* the $33,384.19 partial claim payment and did not list any medical judgment related basis (*e.g.*, medical necessity or experimental / investigational) for partial payment amongst the claim decision EOB codes (*see* Ex. F). Rather, this is a damages dispute (*i.e.*, "rate of payment" dispute) pertaining solely to the underpayment that was predicated on Aetna's aberrant claim decision-making seemingly predicated on the unsubstantiated mystery rate system employed (if a system even exists) by Aetna. And, again, whatever mystery Aetna re-pricing contract / formula / agreement / program that was employed by Defendants is outside of Exhibit A. To be clear, and again, this dispute revolves around the re-pricing established by Aetna separate and distinct from Exhibit A and SCV's contention that the re-pricing contracts separate and distinct from Exhibit A that should have been employed (*see* Ex. C), or SCV's contention that the subject claim should have, at the very least, been re-priced according to publicly available data comparing rates of like providers / facilities

within the subject geography or at the 80th percentile of FAIR Health. To be clear, and again, the re-pricing dispute does not involve a substantive "interpretation of" (or perhaps any "interpretation of") Exhibit A.

18.     Following the adverse Defendants claim underpayment *via* EOB dated December 3, 2018, appeals and / or reconsideration processes were thoroughly carried out by SCV. SCV's redacted reconsideration and appeal letters are attached hereto as **Exhibit H** and are fully incorporated herein by reference. To no avail, Aetna maintained (without any true explanation) its unreasonably low claim underpayment at every turn.

19.     To this day, just has it has wrongly been all along, Defendants continue to keep SCV in the absolute dark as to how a total claim payment of $33,384.19 on a billed amount of $223,988.00 was arrived at and / or is legitimate.

20.     By letter dated June 3, 2019, undersigned counsel sent correspondence to Aetna and BAC advising Defendants that he represented Plaintiff, SCV. The letter contained a request for the entire administrative record / claim file pursuant to the law (the United States Code and, to some extent, Florida Statute) and / or the subject policy / plan documents for that matter. A redacted copy of this June 3, 2019, letter is attached hereto as **Exhibit I** and incorporated fully herein by reference. Of note, undersigned counsel sent a follow-up letter to the June 3, 2019, letter dated October 3, 2019, which such October 3, 2019, letter is also made part of Exhibit I and incorporated fully herein by reference. At no time did Defendants oblige any of the germane materials requested by undersigned counsel

(or by SCV for that matter, *see* Ex. H.

21.    As for ERISA-oriented documentation / information production requirements (which relates to Count I below), the insurance policy / contract speaks to same. *See, e.g.,* Ex. A at 81. This, of course, squares with the Federal Codes cited in, for example, Paragraph No. 1 above. More specifically, the insurance policy / contract / plan document says this:

> As to medical … claims and appeals only, Aetna will provide you with any new or additional evidence considered and rationale, relied upon, or generated by us in connection with the claim at issue. This will be provided to you in advance of the date on which the notice of the final adverse benefit determination is required to be provided so that you may respond prior to that date.

*Id.*

22.    Defendants were legally obligated to either directly provide the aforementioned requested documentation / information (*see* Ex. I) to SCV pursuant to federal codes cited above, in whole or in part, and / or contractually obligated.

23.    There was no substantive Aetna response to undersigned counsel's letters (Ex. I); *i.e.*, no documentation / information production whatsoever from Aetna or BAC.

24.    So, regrettably, SCV's (and C.S.'s) entire valuable pre-suit remedies process (which such pre-suit mechanisms ERISA designed to try to avoid lawsuits like this) was squandered by Defendants by keeping SCV in the "evidentiary" blind due to Defendants' documentation / information production failures and naked

paperwork (*e.g.*, EOB). Defendants' failures, of course, also compromised SCV's ability to make heads-or-tails of Defendants' unreasonably low rate of payment.

25.     Again, if one looks at the EOB (which does not necessitate examination or "interpretation of" Exhibit A), it is plain that coverage is not at issue here – Defendants properly conceded coverage *via* initial partial payment. *See* Ex. F. And, again, as to the codes that SCV places at issue in this lawsuit, one can also look to the pre-authorization paperwork (which does not necessitate examination or "interpretation of" Exhibit A) to see that coverage is not at issue here. *See* Ex. D (as stated earlier, Exhibit D shows that the subject pre-authorization put coverage issues to rest, leaving only pricing issues). Again, the sole issue here is one of payment amount, so we turn now to germane insurance policy language in that vein just for a baseline understanding (not at all for substantive reliance).

26.     As to re-pricing, the insurance policy (Ex. A), as noted above, provides that payment of benefits is based on a "recognized" amount that Defendants either negotiate (*e.g.*, Ex. C) with the medical provider or determine based on a reasonable and customary assessment of such services in the same geography or based on the 80th percentile of FAIR Health. This is where the fleeting examination of Exhibit A would end in this case, which such fleeting examination does not rise to the level needed to establish "relation to" ERISA defensive preemption. Aetna's mystery re-price did not comport with any of the above re-pricing methods.

27.     Again, where (as here) a separate and distinct re-pricing contract / agreement has been established, such a contract / agreement controls. Defendants'

own conduct evidences that much at least – Defendants implemented an Aetna re-pricing contract / agreement / formula / program separate and distinct from Exhibit A. The re-pricing program that Defendants tried to pull off did not "relate to" the aforementioned policy re-pricing options, so Defendants should not now (through their lawyers' *ex post facto* arguments) be heard to say that "relation to" defensive preemption applies to this dispute – at minimum, what is good for the goose is good for the gander.

28.     Defendants' implementation of their mystery re-pricing contract / agreement / formula / program is untenable because SCV did not agree to same.

29.     Defendants erred in refusing SCV's pre-suit requests for germane documentation / information, including documentation / information concerning what re-pricing / allowed amount formula Defendants employed in arriving at the unreasonably low rate of payment. For example, undersigned counsel's June 3, 2019, letter (Ex. I) to Defendants asked for the following:

> **(14)** All guidelines, manuals, written protocol, medical treatises, medical literature, and / or the like upon which the claim administrator and / or plan administrator partially or wholly based its claim(s) decisions; **(15)** All billing paperwork, rate / fee schedules, data or formulas, third-party re-pricing vendor (*e.g.*, PMCS, TRPN, MultiPlan, Viant, Optum, Zelis) paperwork / contracts possessed by the claim administrator and / or plan administrator relating to "usual, customary, reasonable" (UCR) medical provider charges (sometimes referred to as the "eligible expense" or "allowed amount" or "maximum reimbursable charge" assessment), and / or any other data upon which the claim administrator and / or plan administrator has based its decisions as to how much indemnity to afford on the subject claim(s)…

30.     Defendants wronged SCV in many ways, most notably by way of the significant underpayment. Defendants should have employed the PMCS or

MultiPlan re-pricing contracts (Exhibit C) already in place (*i.e.*, already agreed to between the parties) to assess a proper re-priced amount; but, instead, Defendants implemented a mystery re-pricing system (not agreed to by SCV) separate and distinct from Exhibit A to arrive at the unreasonably low rate of payment at issue. At the very least, Defendants' re-pricing assessment should have hinged on geographic compare-and-contrast or the 80th percentile of FAIR Health.

31.     Under the PMCS re-pricing analysis (which, again, was a re-pricing contract / agreement established by Aetna that SCV actually agreed to, and unlike the Aetna re-pricing contract / agreement / formula / program that Defendants unilaterally employed here without SCV's agreement), for example,[10] Defendants should have used an 80% rate to calculate the allowed amount equaling $191,224.00 (which such amount is 80% of all non-implant HCFA line-items and 100% of all implant HCFA line-items). This is the amount that the assumed patient responsibilities (capped at an annual out-of-pocket maximum) should have been deducted from. The $191,224.00 less Defendants' prior payment (which such prior payment presumably already took patient responsibilities subject to the annual out-of-pocket maximum into consideration) leaves an outstanding balance of $157,839.81 due and owing to SCV. This amount is exclusive of attorneys' fees, costs, interest, and / or extra-contractual exposure.

32.     SCV has suffered significant financial harm no matter how one slices

---

[10] "For example" because the MultiPlan re-pricing contract, *see* Ex. C, is also available for use by the trier of fact.

this situation. The financial harm by way of owed medical services monies is in excess of $75,000.00, not including interest of attorneys' fees, costs, or interest, if, for examples, the negotiated, agreed to 80% rate prescribed by Aetna's third-party re-pricing vendors (PMCS) is honored / enforced as it should be, or even if rates prescribed by publicly available databases assessing the charges of providers of like kind within like geographies, like AHCA, were utilized in the re-pricing assessment or even if the 80th percentile of FAIR Health was utilized in the re-pricing assessment.

33.     SCV exhausted the pre-suit appeal process to the best of its ability, hindered by Defendants' wrongful refusal to provide administrative records / claim file / germane documentation required by federal codes (and / or, for that matter, like records available per insurance contract or Florida Statute requiring explanation / substantiation to the recipient of an adverse benefits determination, here SCV), in an effort to accomplish Defendants' doing the right thing (*i.e.*, properly compensating SCV) sans litigation, to no avail. Hence, this lawsuit as SCV's regrettable last resort.

**COUNT I – PETITION TO COMPEL PRODUCTION OF THE "ADMINISTRATIVE RECORD" AND FOR RECOVERY OF ADMINISTRATIVE RECORD PRODUCTION FAILURE PENALTY PURSUANT TO ERISA, 29 U.S.C. § 1024(B), 29 U.S.C. § 1132(c)(1), 29 C.F.R. § 2575.502c-1, AND 29 C.F.R. § 2560.503-1(h)(2)(iii)**

SCV re-alleges Paragraphs 1 through 33 as if fully set forth herein, and further alleges as follows.

34.     This is a claim for production of the administrative record and for

18

award of administrative record production failure penalty pursuant to Title 29, United States Code, Section 1132(c)(1), Title 29, United States Code, Section 1024(b), Title 29, Code of Federal Regulations, Section 2575.502c-1, and Title 29, Code of Federal Regulations, Section 2560.503-1(h)(2)(iii).

35.     By letters (referenced in the above common allegations, *see* Exs. H and I),[11] SCV and / or its legal counsel asked Defendants (and, yes, both Defendants, at least as it pertained to undersigned counsel's letters, *see* Ex. I) to provide the administrative record / germane documentation in relation to the C.S. claim, mainly (but not entirely) to learn Defendants' reasons for claim underpayment so that SCV could contest same in an educated fashion (pre-suit and, only if need be, in suit).

36.     Defendants shirked their legally (whether that be United States Code or Florida Statutes) and also contractually prescribed (tracking ERISA and ERISA's appeal structure, *see* ¶ 21, *supra*) administrative / germane record production responsibilities.

37.     Per the above-cited United States Code and Code of Federal Regulations, *see* ¶¶ 1 and 34, *supra*, the $110.00 / day administrative penalty started accruing July 24, 2019.[12]   From July 24, 2019, through the date of this

---

[11] "Letters" plural because there was follow-up correspondence to Exhibit I and SCV's letters (*see* Ex. H) also requested germane documentation / information.

[12] This represents the date which falls 31 days after the June 3, 2019, request for the administrative / germane records. *See* Ex. I. This is a conservative penalty start state because the clock should have started ticking with SCV's letters. *See* Ex. H.

Complaint (October 13, 2021), 813 days have passed without Defendants' satisfaction of the administrative record / germane record requests made in the aforementioned letters regarding the C.S. claim. So, as of the filing date of this Complaint, the $110.00 / day administrative penalty totals $89,430.00. Of course, the $110.00 / day penalty will continue to accrue until such time that Defendants oblige the germane documentation / information requests (*e.g.,* a certified copy of the policy / plan document, payment rate schedules / formulas, *et cetera*) set forth in the June 3, 2019, letter noted above. *See* Ex. I.[13]

38.     SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendants' wrongful withholding of the administrative record / germane documentation; *i.e.*, claim and appeal decision-making paperwork, which such paperwork necessarily includes, among other things, Aetna paperwork showing exactly how Defendants arrived at their unreasonably low rate of payment.

39.     As a further result of Defendants' refusal to produce the administrative record / germane documentation, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover reasonable attorneys' fees and costs pursuant to Title 29, United States Code,

---

[13] Again, the insurance policy (Ex. A) provides for the very production sought in the June 3, 2019, letter (Ex. I). *See* ¶ 21, *supra*. There is really no need for one to significantly assess this insurance policy language (because of United States Codes and Code of Federal Regulations dictating documentation / production anyway), but it is cited herein to demonstrate that the insurance policy squares with the federal codes under which Count I is brought. And there is obviously no ERISA preemption issue applicable to consulting the insurance policy / plan document (Ex. A) in relation to Count I anyway because Count I (unlike Counts II-IV) sounds in ERISA.

Section 1132(g)(1) or as otherwise awardable.

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, respectfully requests (a) Court order compelling Defendants, Aetna Life Insurance Company and Brevard Achievement Center, Inc., to produce the outstanding administrative record / germane documentation posthaste and allowing SCV thirty days following production of the administrative record / germane documentation to amend this Complaint (if necessary), (b) an award to SCV of the administrative record production failure penalty incurred by Defendants pursuant to Title 29, United States Code, Section 1132(c)(1), Title 29, United States Code, Section 1024(b), Title 29, Code of Federal Regulations, Section 2575.502c-1, and Title 29, Code of Federal Regulations, Section 2560.503-1(h)(2)(iii), (c) an award to SCV of attorneys' fees (pursuant to Title 29, United States Code, Section 1132(g)(1)) and costs incurred bringing this action, and (d) the Court's affording of any other relief the Court deems equitable, just, and / or proper.

## COUNT II – BREACH OF CONTRACT (CLAIM UNDERPAYMENT)

SCV re-alleges Paragraphs 1 through 33 as if fully set forth herein, and further alleges as follows.

40.    At all material times to this action and in exchange for a valuable premium, Defendants provided health insurance to C.S. under the plan document (Exhibit A).

41.    The subject medical services were covered under the plan document, as evidenced by, for examples, (a) Defendants' partial payment relating to same,

(b) the Aetna-issued EOB (Ex. F), (c) pre-authorization paperwork (Ex. D) approving the subject HCFA codes (Ex. E), and (d) *et cetera*. A fuller discussion as to why coverage is not at issue in this pure pricing dispute can be found in the above common allegations, namely Paragraphs 9-10.

42.     Defendants erred in deciding to not fully compensate SCV by only tendering a $33,384.19 underpayment in relation to $223,988.00 in billed charges predicated on Defendants' mystery re-pricing contract / agreement / formula / program separate and distinct from Exhibit A. As to all codes set forth on the HCFA (Ex. E), Defendants should have honored the re-pricing contracts (PMCS and / or MultiPlan) included in Exhibit C that the parties had actually already agreed to. Defendants' payment amount comes nowhere close to the re-pricing formulas prescribed by PMCS and (80% HCFA non-implant codes / 100% HCFA implant codes). *See* ¶ 31, *supra*. Defendants' payment amount is accordingly in breach of the subject re-pricing contracts (Ex. C).[14]

43.     Defendants' $33,384.19 underpayment does not constitute a usual, customary, reasonable re-priced / allowed amount no matter how one views the situation. First, for example, third-party repricing vendors who Aetna contracts with (*e.g.*, PMCS, MultiPlan) have established SCV's UCR based re-priced / allowed amount at 80% of billed charges (at least pursuant to PMCS in relation to

---

[14] And, again, at minimum, Defendants' payment amount also does not come anywhere close to "reasonable and customary" rates within the subject geography. Again, that kind of information can be easily found in the public domain through very reputable sources, *see* n. 7, *supra*. And, again, Defendants' payment amount does not come anywhere close to the 80th percentile of FAIR Health.

non-implant HCFA line-items).[15] Second, as another example, unbiased public databases (*e.g.*, AHCA) assessing the rates of providers of like kind within like Florida geographies make clear that Defendants' unsubstantiated unreasonably low payment does not find support amidst UCR rates relating to providers of like kind within like Florida geographies. Third, as another example, Defendants' payment rate does not comport with the 80th percentile of FAIR Health.

44.     Defendants, among other things, had a duty to properly investigate the subject medical services, adjust / investigate the subject SCV claim relating to such services, and fully compensate SCV in relation to same. Defendants failed SCV in these regards (most notably with respect to their failure to pay the monies due and owing under the subject re-pricing contracts), which breached the subject re-pricing contracts / agreements and / or violated Florida law. Such underpayment even runs afoul of the Plan document's geographical assessment and FAIR Health chatter.

45.     As a direct, foreseeable, and proximate result of Defendants' breach of their obligations under the re-pricing contracts, SCV has suffered and continues to suffer damages.

46.     SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendants' underpayment of the monies owed to it in relation to the subject C.S. medical services.

---

[15] Under MultiPlan, 60% for non-implant items, and 120% for implant items.

47. As a further result of Defendants' refusal to fully compensate SCV, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover its reasonable attorneys' fees and costs pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable.

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, requests the entry of judgment against Defendants, Aetna Life Insurance Company and Brevard Achievement Center, Inc., for liability and for damages including, but not limited to, (a) past-due contractual monies owed in relation to the subject medical services and all associated awardable accrued interest, (b) attorneys' fees pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT III – UNJUST ENRICHMENT

SCV re-alleges Paragraphs 1 through 33 as if fully set forth herein, and further alleges as follows.

48. SCV conferred a direct benefit on Defendants by providing Defendants' insured / member (C.S.) with medical services to which the insured was entitled under the insurance policy (covered) as evidenced by Defendants' partial payment. Examples of "conferral of benefit" would include the following, for examples, which are posed as questions: (a) What about Defendants receiving the benefit when their policyholder / employee received care and treatment offering Defendants' insurance policy as their primary method of payment? (b)

What about the good health of C.S. conferred on Defendants? Was it not of benefit to Defendants that SCV minimized (if not entirely eliminated, actually) C.S.' future medical expense (and insurance claims to Defendants) relating to the subject conditions such as prolonged alternative treatments or a return for more (and perhaps more complex) surgery due to complications arising out of some other inferior treatment regimen? Similarly, was it not of benefit to Defendants that C.S. was presumably able to return to work within a reasonable amount of time given SCV's good medical care?

49.     Defendants voluntarily accepted and received the benefit conferred by SCV, with the knowledge that SCV expected to be paid the reasonable value of its services; *i.e.*, SCV's usual, customary, reasonable charges as prescribed by reasonable, negotiated re-pricing vendors (*e.g.*, PMCS, MultiPlan) or, for that matter, as prescribed by Florida's publicly available AHCA database assessing rates of various medical providers of like kind within like geography. Or, heck, the 80th percentile of FAIR Health probably would have sufficed. Again, as to Defendants' knowledge, there are several things supportive of same in the above common allegations; *e.g.*, the pre-authorization process, SCV's claim submission package cover letter and package (which such package included things like the HCFA and germane aspects of the PMCS and MultiPlan re-pricing contracts), the parties past dealings with each other (in particularly Aetna and SCV, but perhaps also BAC and SCV), and *et cetera*.

50.     Defendants voluntarily accepted and received the benefit conferred

by SCV, with the knowledge (through course of past dealings with SCV that included claim submission cover letters such as that attached as Exhibit G indicating re-pricing contract expectations, or otherwise) that SCV expected to be paid the reasonable value of its services; *i.e.*, SCV's UCR charges as prescribed by reasonable re-pricing vendors (*e.g.*, PMCS, MultiPlan) or, for that matter, as prescribed in the Florida's publicly available AHCA database assessing rates of various medical providers of like kind within like geography. And, once more, the 80th percentile of FAIR Health probably would have even sufficed. But what is clear is that Defendants' unreasonably low payment amount predicated on some mystery Aetna re-pricing formula was / is entirely unacceptable.

51. Defendants have not paid the value of the benefit conferred by SCV in that Defendants have significantly underpaid SCV's claim for monies owed in relation to the medical services provided to C.S.

52. Defendants' underpayment results in a windfall for Defendants in that (a) Defendants collect premiums in return for agreeing to properly compensate providers, like SCV, who render covered medical services, and / or (b) Defendants enjoy an unearned profit in relation to the insurance benefits themselves, in relation to interest that has accrued on the wrongly withheld benefits, in relation to investment returns enjoyed through the monies wrongly withheld from SCV, in relation to level-funded plan profits enjoyed through the wrongly withheld monies, and / or *et cetera*.

53. It is unjust under the circumstances for Defendants to underpay

SCV's claim.

54.     SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendants' underpayment of the monies owed to it in relation to the subject medical services.

55.     As a further result of Defendants' refusal to fully compensate SCV, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover its reasonable attorneys' fees and costs pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable.

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, requests the entry of judgment against Defendants, Aetna Life Insurance Company and Brevard Achievement Center, Inc., for liability and for damages including, but not limited to, (a) past-due monies owed for the subject medical services and all associated awardable accrued interest, (b) attorneys' fees pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT IV – *QUANTUM MERUIT*

SCV re-alleges Paragraphs 1 through 33 as if fully set forth herein, and further alleges as follows.

56.     SCV conferred a direct benefit on Defendants by providing Defendants' insured / member (C.S.) with medical services to which the insured was entitled under the insurance policy (covered) as evidenced by Defendants'

partial payment. Examples of "conferral of benefit" (in the form of questions) are discussed in Paragraph 48, *supra*, and incorporated into this count by reference.

57. SCV billed Defendants its UCR charges for the services as prescribed by reasonable re-pricing vendors (*e.g.*, PMCS, MultiPlan) or, for that matter, as prescribed by Florida's publicly available AHCA database assessing rates of various medical providers of like kind within like geography. The billed charges represent the fair market value of the services rendered.

58. Defendants received the bill from SCV but underpaid SCV for the services.

59. An implied contract was doubtless established through Defendants' knowledge that services were being rendered and both sides intended for compensation to be paid, with the parties possessing the compensation intention through the course of their past dealings (such as through claim submission letters like Exhibit G routinely furnished to Aetna indicating SCV's expectation to be paid pursuant to the subject re-pricing contracts) or otherwise.

60. In order for the implied contract to have been formed, Defendants did not have to be the recipient of the services or request the services.

61. SCV is entitled to reasonable compensation for the services (*i.e.*, *quantum meruit*), which is by no means accomplished by Defendants' unsubstantiated unreasonably low payment but is reflected in reasonable sources such as third-party re-pricing vendors' (*e.g.*, PMCS, MultiPlan) or Florida's publicly available AHCA databases of assessments of SCV's rates. And

determination of the proper amount of compensation is a question of fact reserved for a jury.

62.   The circumstances are such that it would be inequitable for Defendants to retain the benefit of the subject medical services without paying SCV the proper value for same.

63.   SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendants' underpayment of the monies owed to it in relation to the subject medical services.

64.   As a further result of Defendants' refusal to fully compensate SCV, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover its reasonable attorneys' fees and costs pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable.

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, requests the entry of judgment against Defendants, Aetna Life Insurance Company and Brevard Achievement Center, Inc., for liability and for damages including, but not limited to, (a) past-due monies owed for the subject medical services and all associated awardable accrued interest, (b) attorneys' fees pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

**JURY DEMAND**

65.   Plaintiff, Surgery Center of Viera, LLC, demands a trial by jury on all issues so triable as a matter of right.

Dated:  October 13, 2021.

Respectfully Submitted,

**CALLAGY LAW, P.C.**
1900 N.W. Corporate Blvd., Ste 310W
Boca Raton, Florida  33431
(561) 405-7966 (o); (201) 549-8753 (f)

/s/ Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
Fla. Bar No. 41103
jgreyber@callagylaw.com
hcasebolt@callagylaw.com
*Attorney for Plaintiff*